UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FERRIN GREEN and KNOW YOUR
DOPE L.L.C.,

                Plaintiffs,

    – against –

RUN-DMC BRAND LLC,
NBCUNIVERSAL MEDIA, LLC,
PEACOCK TV LLC, BELIEVE
ENTERTAINMENT GROUP, LLC, ERIK
BLAMOVILLE SR., and ERIK
BLAMOVILLE JR.,

                Movants.

**OPINION & ORDER**

24-cv-03900 (ER)

---

RAMOS, D.J.:

    Ferrin Green and Know Your Dope L.L.C. ("KYD") (together "Plaintiffs"), filed this action against Run-DMC Brand LLC ("Run-DMC"), NBCUniversal Media, LLC ("NBCUniversal"), Peacock TV LLC ("Peacock"), Believe Entertainment Group, LLC ("Believe Entertainment"), Erik Blamoville Sr. ("Blamoville Sr."), and Erik Blamoville Jr. ("Blamoville Jr.," and together with Blamoville Sr., the "Blamoville Defendants"), alleging that Movants exploited eight of Plaintiffs' photographs without Plaintiffs' knowledge or authorization.

    Run-DMC, Blamoville Sr., and Blamoville Jr. (together "Movants") now move to dismiss certain of the claims against them on various grounds. First, they seek to dismiss claims for providing false copyright management information ("CMI") and tortious interference with economic relations for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Next, Movants contend that Plaintiffs' claims for declaratory judgement and unjust enrichment are preempted by the Copyright Act of 1976, and that Plaintiffs' claims for misrepresentation and unjust enrichment should be

dismissed because they are duplicative of Plaintiffs' breach of contract claim. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.   BACKGROUND

### A.  Factual Background

The following facts are drawn from allegations contained in the first amended complaint, Doc. 38, which the Court accepts as true for purposes of the instant motion. *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2nd Cir. 2012).

On August 11, 2023, Run-DMC, a former hip-hop group, performed live at a hip-hop concert at Yankee Stadium (the "Concert"). ¶ 26. Prior to the Concert, on August 7, 2023, Green, a photographer, was contacted by Blamoville Jr., a Run-DMC representative, to hire Green's company, KYD, to photograph a pop-up event that was to take place two days before the Concert. *Id*. That same day, Blamoville Jr. texted Green telling him that "there was no budget to pay KYD's standard rates for photographic and creative direction services for the pop-up." *Id.*

Green acknowledged and requested press access for himself and a colleague to the Concert. ¶ 28. In lieu of payment, Green agreed to photograph the Run-DMC performance and the sets of the other performers at the Concert. *Id.* Green knew that this was a one-time event and also likely the last performance by Run-DMC, since the group had broken up years prior. ¶ 29. He also knew that the value of the photographs captured at the event would likely be of "significant historical and commercial value." *Id.* Green was willing to waive his customary fees because of the financial gain he could obtain through licensing copyrights in the photographs. *Id.*

Green claims that Blamoville Jr. texted him on August 10, 2023 letting him know that Run-DMC agreed to grant him press access to the Concert in exchange for his services. ¶ 30. Blamoville Jr., on behalf of Run-DMC, provided Green and his KYD colleague with backstage access to photograph the Concert. ¶ 31. Green and his

colleague were also given access to the stage and the pit in order to photograph the performance. ¶ 32.

Green took many photos at the Concert, including the eight photos in question. ¶ 33. Green exerted complete control and artistic discretion over the photographs that he took, using his own equipment. ¶¶ 35–36. He claims that his photos were taken using his original creative expression and are therefore unique, and because of his vantage point, no similar photographs of the event exist. ¶¶ 37–38. He argues that the photos do not qualify as "works made for hire" under the Copyright Act. ¶ 40.

While in the backstage area, Blamoville Jr. told Green that Run-DMC would be sending paperwork so the parties could document their understanding concerning credit and compensation for use of the photographs that Green captured during the concert. *Id.* While Green was backstage, Blamoville Jr., told Green that, "before any of the photographs [he] captured were used in any way other than on Run-DMC's noncommercial social media, Green would be notified, [and] be given the opportunity to approve of the particular use." ¶ 42. Blamoville Jr. also allegedly stated that the parties would enter into a written agreement concerning the terms and scope of any and all uses of the photographs, including credit and compensation. *Id.* Despite these verbal representations, no defendant or any other individual involved with Run-DMC ever provided Green with the promised contract. ¶ 43.

On August 12 or 13, 2023, Green sent Blamoville Jr., a Dropbox link with the photographs for the previously agreed upon sole purpose of Run-DMC displaying them on their noncommercial social media. ¶ 45. Green claims that he included accurate CMI when he sent the photographs by clearly identifying Green as the author of the photographs in the Dropbox folder name. ¶ 100. Through the end of 2023 and in early 2024, Green had conversations with multiple third parties, including a museum and a number of art galleries, about releasing limited edition sets of "photographic fine art prints" of the photographs for exhibition and sale. ¶ 46.

Run-DMC allegedly provided the photographs to NBCUniversal, Peacock and Believe Entertainment for their use in the documentary series "Kings From Queens" (the "Docuseries") without notifying Green or acknowledging him as the author. ¶¶ 3, 47. The Docuseries was produced by Believe Entertainment and released by Peacock, a subsidiary of NBCUniversal. ¶ 3. Plaintiffs allege that Run-DMC and the Blamoville Defendants removed CMI that identified Green as the author of the photographs. ¶ 102. Plaintiffs also allege that Blamoville Sr. represented to NBCUniversal, Peacock, and Believe Entertainment that he was the author of the photographs and therefore had authority to permit their use in the Docuseries. ¶ 48.

On February 1, 2024, before the public release of the Docuseries, Green attended a screening of the first two episodes and realized that eight of his photographs had been included in the Docuseries without his knowledge or consent. ¶¶ 1, 49. Green confirmed that his photographs were included in the Docuseries the next day, on February 2, 2024. ¶ 50. Green alleges that he "did not and ha[d] not licensed or authorized any of the Defendants to publish, reproduce, display, or distribute the photographs in the Docuseries." ¶ 51. Green never received any payment from any of the defendants for the photographs in question. ¶ 44.

That same day, on February 2, 2024, Green sent Defendants notices requesting that Defendants credit the photographs to him and enter into a valid licensing agreement for the photographs. ¶ 52. Believe Entertainment initially responded by agreeing that the parties should enter into a licensing agreement for the photographs. ¶ 53. Green followed up, but states that Believe Entertainment did not respond to his emails because Blamoville Sr. "interfered" with the negotiations. ¶¶ 53–54. NBCUniversal and Run-DMC did not respond to his notices. ¶ 55.

On February 12, 2024, Believe Entertainment told Green that the photographs were removed from the Docuseries on February 10, 2024. ¶ 56. The Docuseries remains on the Peacock streaming platform, albeit without the photographs. *Id.* Green applied to

4

register the photographs with the U.S. Copyright Office on February 16, 2024, and they are now registered with the U.S. Copyright Office with Registration No. VAu001523519. ¶¶ 5–6.

On February 20, 2024, an attorney for Run-DMC sent Plaintiffs a cease-and-desist letter demanding that they refrain from any communication with NBCUniversal and Believe Entertainment. ¶ 57. The letter also allegedly erroneously claimed that Run-DMC owned all rights in and to the photographs and threatened Plaintiffs with legal action. *Id.* Plaintiffs claim that Movants have been unjustly enriched from their unauthorized use and distribution of the photographs. ¶ 58. Plaintiffs also assert that they have suffered damages caused by Movants' interference with Green's exclusive rights and copyrights to the photographs. ¶ 59.

### B. Procedural Background

Plaintiffs filed this instant action on May 20, 2024, and amended the complaint on August 19, 2024. Docs. 1 and 38. Plaintiffs allege seven claims: (1) copyright infringement; (2) declaratory judgment; (3) providing false CMI; (4) misrepresentation; (5) tortious interference with economic relations; (6) breach of contract; and (7) unjust enrichment. *Id.*

On September 19, 2024, Movants moved to partially dismiss five of the seven claims[1] against them for failure to state a claim pursuant to Rule 12(b)(6), preemption by the Copyright Act of 1976, and for duplicative claims. Doc. 40. Specifically, Movants argue that: (1) Plaintiffs' claims for declaratory judgment (Claim 2) and unjust enrichment (Claim 7) are preempted by the Copyright Act; (2) Plaintiffs failed to state a cause of action for providing false CMI (Claim 3) and tortious interference with economic relations (Claim 5); and (3) Plaintiffs' claims for misrepresentation (Claim 4) and unjust enrichment (Claim 7) are duplicative of the breach of contract claim. *Id.*

---

[1] Movants are not moving to dismiss the copyright infringement or breach of contract claims.

II.   **LEGAL STANDARD**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard.  *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N. Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Doe v. New York University*, No. 20 Civ. 1343 (GHW),

6

2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III. ANALYSIS

### A. Copyright Preemption

Movants argue that Plaintiff's declaratory judgment and unjust enrichment claims are preempted by the Copyright Act. Doc. 41 at 12. The Copyright Act preempts a state law claim only if: (1) the work at issue comes within the subject matter of copyright; and (2) the right being asserted is equivalent to any of the exclusive rights within the general scope of copyright. 17 U.S.C. § 301(b); *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

The first prong of the copyright preemption analysis is met if "the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004). Subject matter here "includes all works of a type covered by sections 102 and 103." *Forest Park*, 683 F.3d at 430. The photographs are pictorial works protected by the Copyright Act. 17 U.S.C. § 102(a)(5).

The second prong of the preemption analysis is the "general scope requirement," which asks whether the rights being asserted through the state law claims are the same as the rights protected by the Copyright Act. *Briarpatch*, 373 F.3d at 305–06. The state law claim must involve acts of reproduction, adaptation, performance, distribution or display. *Id.* Further, it must not include any extra elements that make it qualitatively different from a copyright infringement claim. *Id.* To determine whether a claim is qualitatively different, the Court looks at what the plaintiff seeks to protect and the theories in which the matter is thought to be protected and the rights sought to be enforced. *Id.* Moreover, the Court takes a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim. *Id.* Awareness or intent, for instance, are not extra elements that make a state law

claim qualitatively different. *Id.*; *see also We Shall Overcome Foundation v. The Richmond Organization, Inc., et. Al*, 221 F. Supp. 3d 396, 411 (S.D.N.Y. 2016).

### 1. Declaratory Judgment

Federal courts exercise "unique and substantial discretion in deciding whether to declare the rights of litigants." *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330 (S.D.N.Y. 2014) (citations omitted). A plaintiff must allege "'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). A defendant's cease-and-desist letter is sufficient to establish "adverse legal interests" under the Declaratory Judgment Act. *Gelmart Indus., Inc.*, 120 F. Supp. 3d at 331 (citations omitted); 28 U.S.C. § 2201 *et seq.*

Plaintiffs argue that they only seek a declaratory judgment as to the *authorship* of the photographs, and specifically disclaim that they seek a declaration concerning the right to reproduce, create derivative works, distribute, or publicly perform and display the photographs. Doc. 42 at 21–22. Thus, the general scope prong of the preemption analysis thus is not satisfied. Accordingly, Movants' request to dismiss Plaintiffs' declaratory judgment claim is DENIED.

### a. Unjust Enrichment

Plaintiffs plead an unjust enrichment claim, a common law cause of action, against Run-DMC and the Blamoville Defendants. ¶¶ 156–65. Movants contend that Plaintiffs' unjust enrichment claim is preempted by the Copyright Act and is duplicative of the breach of contract claim.

Here, Plaintiffs allege that Movants asserted rights to license, reproduce, display, and distribute the photographs and profited from such unauthorized uses. ¶¶ 57–58. These are core rights governed by the Copyright Act. The subject matter prong of the preemption test is satisfied because it falls "within the ambit of one of the categories of

copyrightable works." *Briarpatch*, 373 F.3d at 305. The general scope prong is also satisfied because the claim involves "acts of reproduction, adaptation, performance, distribution or display" and is not "qualitatively different from a copyright infringement claim." *Id.*

Accordingly, the unjust enrichment claim is preempted by the Copyright Act and is therefore DISMISSED.

### B. Providing False CMI

The Digital Millennium Copyright Act ("DMCA") prohibits a person from knowingly, and with the intent to "induce, enable, facilitate, or conceal infringement," either "provide" or "distribute" false CMI. *Aaberg v. Francesca's Collections, Inc.*, No. 17 Civ. 115 (AJN), 2018 WL 1583037 (S.D.N.Y. Mar. 27, 2018) (citing 17 U.S.C. § 1202(a)). The DMCA also prohibits the removal or alteration of CMI and states that without the authorization of a copyright owner or the law, no person shall:

> (1) intentionally remove or alter any copyright management information;
>
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law; or
>
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b).

To state a claim pursuant to the DMCA, a plaintiff must plausibly allege that the defendant knowingly provided false CMI and that the defendant did so with the intent to induce, enable, facilitate, or conceal an infringement. *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018).

Here, Green's photographs included CMI identifying him as the author, which was allegedly removed by Run-DMC and the Blamoville Defendants. ¶¶ 100, 102. Instead, Blamoville Sr. claimed that he was the author of the photographs, which he provided to NBCUniversal, Peacock, and Believe Entertainment without notifying Green or acknowledging him as the author. ¶¶ 3, 47–48.

Additionally, Green sent Blamoville Jr. the photographs for the agreed upon sole purpose of allowing Run-DMC to post them on their noncommercial social media. ¶ 45. However, after falsely claiming authorship, Blamoville Sr. provided the photographs for use in the Docuseries, even though Green "did not and ha[d] not licensed or authorized any of the Movants to publish, reproduce, display, or distribute the photographs in the Docuseries." ¶¶ 51, 102. This plausibly shows that Movants knowingly provided false CMI to intentionally facilitate an infringement. *Krechmer*, 747 F. App'x at 9.

Further, even after Green registered the photographs with the U.S. Copyright Office, ¶¶ 5, 6, Run-DMC still claimed that it owned all rights in and to the photographs and threatened Plaintiffs with legal action. ¶ 57. Based on these facts, Plaintiffs also sufficiently allege that Movants altered and distributed CMI that was false.

Accordingly, the Movants' motion to dismiss Plaintiffs' claim for providing false CMI is DENIED.

### C. Misrepresentation

Plaintiffs also argue that Run-DMC and the Blamoville Defendants are liable for misrepresentation. Plaintiffs assert that the Movants provided Believe Entertainment the photographs, claimed ownership over them, and interfered with the negotiations between Believe Entertainment and Green to cover up the infringement, with an intention to defraud Plaintiffs. ¶¶ 11, 121. Movants move to dismiss Plaintiffs' claim for misrepresentation because it is duplicative of Plaintiffs' breach of contract claim.

For a fraud claim, like misrepresentation, to be successful under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the

defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153 (2d Cir.1995).

Moreover, "New York law [] requires that a fraud claim, raised in a case that stems from breach of contract be 'sufficiently distinct from the breach of contract claim.'" *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 306–07 (S.D.N.Y. 2010) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)). In order for a fraud claim to be "sufficiently distinct" from a breach of contract claim, it must be based on "more than a defendant's false statements indicating an intention to perform his or her obligations under a contract." *Karsch v. Blink Health Ltd.*, 291 F. Supp. 3d 503 (S.D.N.Y. 2018) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)). "Simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Best Western International, Inc. v. CSI International Corp.*, No. 94 Civ. 0360 (LMM), 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994).

Plaintiffs' factual allegations do not support their argument that the misrepresentations are different from the breach of contract claim. Green alleges that on August 11, 2023, Blamoville Jr. told Green that he would be receiving paperwork from Run-DMC regarding "credit and compensation with respect to any and all uses by Run-DMC of the photographs Plaintiffs captured of Run-DMC during the Concert." ¶ 41. According to Plaintiffs, Blamoville Jr. also promised that in the absence of an agreement, the photographs would only be used for Run-DMC's social media in a noncommercial manner. *Id*. Blamoville Jr. explained that should Movants wish to use the photographs in any other way, Green would be notified and be allowed to approve the particular use.

¶ 42.  The parties would then enter into a written agreement outlining the terms, including credit and compensation for Green, for any and all uses of the photographs.  *Id.*  Despite these representations, Plaintiffs allege that no defendant ever provided them with the promised documentation, and thus never signed any written contract with anyone regarding the photographs.  ¶ 43.  Based on these representations, Green sent the photographs to Blamoville Jr. on August 12 or 13, 2023.  ¶ 45.  Each of these allegations also forms the basis for Plaintiffs' breach of contract claim.  ¶¶ 131–155.

These allegations concern Movants' purported failure to fulfill promises that are squarely contractual in nature—namely, to deliver a written agreement, to restrict use of the photographs, and to negotiate terms before any broader use.  As such, Plaintiffs' misrepresentation claim merely repackages their breach of contract allegations and cannot stand as an independent tort claim.  *Karsch*, 291 F. Supp. 3d at 507.

The misrepresentation claim is thus duplicative of the breach of contract claim and is DISMISSED.

### D. Tortious Interference with Economic Relations

To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that:  "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (citing *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir.2003)).

Plaintiffs argue that Run-DMC and the Blamoville Defendants tortiously interfered with their relationship with Believe Entertainment.  ¶ 11.  Movants argue that the claim should be dismissed because Plaintiffs do not sufficiently plead that Plaintiffs had a business relationship with Believe Entertainment, or even if it did, that Movants acted out of malice or used improper means.  Doc 41 at 18–19.

12

A business relationship can be "*any* prospective contractual relation[] . . . if the potential contract would be of pecuniary value to the plaintiff." *Jim Mazz Auto, Inc. v. Progressive Casulty Ins. Co.*, No. 08 Civ. 00494 (JM), 2009 WL 891837, at *7 (W.D.N.Y. Feb. 5, 2009), report and recommendation adopted as modified, No. 08 Civ. 00494, 2009 WL 910969 (W.D.N.Y. Mar. 31, 2009). Green requested that Believe Entertainment credit his photographs and enter into a licensing agreement, to which Believe Entertainment initially agreed. ¶¶ 52–53. Even though Believe Entertainment did not respond to Green's follow-up emails and no contract was ever formed, ¶ 53, that potential licensing agreement would have been of pecuniary value to Green. Accordingly, the first prong is established.

Regardless, the claim also fails on the third prong. To satisfy the third element, the Defendant must have acted solely out of malice or have used improper means. *Kirch*, 449 F.3d at 400. Actionable "improper means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 624 (1996) (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). Persuasion alone, even when knowingly directed at a specific business relationship, is not enough. *Id*.

To satisfy the third element of a tortious interference claim, "as a general rule, a defendant's conduct must amount to a crime or an independent tort," because "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability with interference with prospective contracts or other non-binding economic relations." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (N.Y.2004) ("*Carvel II*"), 3 N.Y.3d at 190 (citing *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc*., 641 N.Y.2d 614, 624 (N.Y.1996)). The only exception to the general rule is when a defendant engages in conduct "for the sole purpose of inflicting

13

intentional harm on [the] plaintiff." *Id*. at 190.  The *Carvel II* court went on to explain that economic pressure is only "wrongful" when it is "extreme and unfair." *Id*. at 192–93.  Other courts have also interpreted *Carvel II* to mean that economic pressure can satisfy the "wrongful means" requirement only when it is "extreme and unfair," and exerted "for the sole purpose of inflicting intentional harm on [the] plaintiff." *See, e.g., Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 172 (S.D.N.Y.2008), aff'd, 321 F. App'x 58, 60 (2d Cir.2009); *see also Darby Trading Inc. v. Shell Int'l Trading & Shipping Co*., 568 F. Supp. 2d 329, 343–47 (S.D.N.Y.2008).

  The complaint alleges that Green's photographs were included in the Docuseries without his knowledge or consent, and that although Believe Entertainment initially suggested that the parties enter into a licensing agreement for the photographs, it eventually removed them from the Docuseries.  ¶ 56.  The complaint conclusorily alleges that the agreement was not reached because Blamoville Sr. "interfered" with the negotiations, without providing any additional facts.  ¶¶ 53–54.  In any event, Defendants' conduct did not amount to the "crime or an independent tort" required by *Carvel II*.  3 N.Y.3d at 190.  Nor do Plaintiffs allege that the economic pressure they faced was "extreme and unfair." *Friedman*, 551 F. Supp. 2d at 172.  Plaintiffs do not allege that Movants applied economic pressure to intentionally harm them, let alone "for the sole purpose of" doing so.  *Id*.; *Learning Annex Holdings, L.L.C. v. Whitney Education Group, Inc.*, 765 F. Supp. 2d 403, 412 (S.D.N.Y. 2011) (noting that no cause of action for tortious interference with business relations may survive where the defendant was "motivated by legitimate economic self-interest").  The complaint thus fails the third prong.

  Accordingly, Movants' request to dismiss Plaintiffs' claim for tortious interference with economic relations is GRANTED.

IV.  **CONCLUSION**

For the reasons set forth above, Movants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Movants' motion is GRANTED as to the misrepresentation, tortious interference with economic relations, and unjust enrichment claims, and DENIED as to the declaratory judgment and providing false CMI claims.

The parties are directed to appear for a conference on August 15, 2025, at 10 a.m. in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 40.

It is SO ORDERED.

Dated:   July 18, 2025
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.